In the Matter of WELCO ASSOCIATES et al., Appellants, v
ROBERT GORDON et al., Respondents.

First Department, January 9, 1992

### APPEARANCES OF COUNSEL

*Jay R. Fialkoff* of counsel *(Robert J. Zastrow* and *Kenneth Pasquale* with him on the brief; *Stroock & Stroock & Lavan,* attorneys), for appellants.

*Francis V. Imbornone* of counsel *(Marc J. Luxemburg* and *Cindy S. Birnbaum* with him on the brief; *Snow Becker Krauss P. C.,* attorneys), for Robert Gordon and others, respondents.

### OPINION OF THE COURT

MILONAS, J. P.

The issue involved in this case, which was described as novel by the Supreme Court, is whether the sponsor of a cooperative conversion, after terminating "special developer control", can reinstate its control over the board of directors based upon its authority under the offering plan and the corporate bylaws.

Petitioner Welco Associates, of which petitioner Frederick Elghanayan is a partner, was the sponsor of a plan to convert a luxury building containing approximately 330 apartments to cooperative ownership. The conversion occurred on or about March 31, 1988. Respondent Turtle Bay Towers Corporation is the cooperative owner of the subject land and building, which is located at 310 East 46th Street in Manhattan. Pursuant to the offering plan and the bylaws of the corporation, the sponsor would lose voting control over the board of directors after the earlier of the fifth anniversary of the closing of the conversion (that is March 31, 1993) or the acquisition of a

majority of the shares by bona fide purchasers. In addition, the offering provided that the sponsor would retain 11 commercial leases for stores, the garage, management office and storage spaces on the property.

At the first annual meeting of the cooperative on April 28, 1988, the directors appointed by the sponsor resigned, and a new board of directors was elected. Only two of the five members of this board were designated by the sponsor despite the fact that it still owned a large majority of the shares; the remaining three directors were chosen by the resident shareholders. The tenth amendment to the plan, dated May 31, 1988, acknowledged that the new board of directors consisted of two directors who were controlled by the sponsor and three bona fide subscribers. The sponsor also gave the requisite notice to the tenants of the termination of "special developer control", as defined in the Condominium and Cooperative Abuse Relief Act (15 USC §§ 3601-3616), that title had passed to the cooperative and a new board of directors had been elected. Another annual meeting ensued the following spring, and a new board of directors was voted. Once again, the sponsor selected two of five members, and the results of the election were reflected in the filing on March 1, 1990 of a fifteenth amendment to the plan.

At a special meeting held on April 3, 1990, the shareholders were advised by their counsel that a Federal statute, the aforementioned Condominium and Cooperative Abuse Relief Act, permitted the cooperative to terminate certain leases executed by the sponsor. However, representatives of the sponsor advised the shareholders of the latter's opposition to any such termination. The sponsor also offered the cooperative a $500,000 payment in settlement of the lease dispute. The shareholders rejected the proposal and voted to proceed with the termination of the garage, management office and commercial space leases. A notice of termination was served on the sponsor shortly thereafter. In response, the sponsor demanded arbitration as provided for in the subject leases. The sixteenth amendment to the plan made mention of the notice of arbitration and stated the sponsor's intention to take appropriate action "with respect to the purported termination of the affected leases, including, but not limited to, seeking damages, costs and attorneys fees". Further negotiations between the cooperative and the sponsor led to a settlement in September of 1990 pursuant to which the sponsor surrendered

the garage lease and agreed to pay $25,000 in cash on August 1st in each of the following four years.

The cooperative's next annual meeting took place on July 18, 1991. The sponsor still owned 39,867 shares, about two thirds of the total number of shares in the corporation, and was responsible for the same portion of the maintenance charges. The sponsor's representatives, in person and by proxy, had control of 41,834 shares, or 80% of all shares produced at the meeting. Indeed, since only 9,000 shares were controlled by nonsponsor shareholders, there would have been no quorum without the sponsor's shares. The president of the cooperative proceeded to appoint the inspectors of election, and the sponsor nominated four persons for election to the board to which no objections were voiced. Nonsponsor shareholders nominated three individuals. Then ballots were cast for the five director vacancies. As a result of the voting, the five candidates chosen by the sponsor, three of which were sponsor nominees and two nonsponsor candidates, received the largest number of votes cast. However, a question was raised concerning the right of the sponsor to vote its shares, and the inspectors of election did not resolve the issue. Instead, they simply left the meeting without certifying the election.

Since the new board was not yet officially in office, the old board called a special meeting for July 22, 1991 in the apartment of the president of the cooperative. According to the sponsor, it received no notice of this meeting until after it had been held. In any event, at that time the old board provided a $10,000 retainer to the law firm of one the inspectors of election and approved a highly favorable modification of the current management agreement with the company which employed the other inspector of elections. Three days after this meeting, the inspectors of election rendered a report completely invalidating the ballot cast by the sponsor so that the new board of directors was selected by less than 15% of the corporative shares.

The instant proceeding was commenced under Business Corporation Law § 619 prior to the submission of the inspectors' report in order to confirm the results of the July 18th election and to enjoin the acting board from entering into any contracts or disbursing funds except in the ordinary course of business. Respondents cross-moved for dismissal of the petition, arguing that the sponsor had other remedies available to it if it believed that the board was acting contrary to its fiduciary duties.

The Supreme Court concluded that once a sponsor relinquishes control over a cooperative's board of directors and pronounces termination of "special developer control", such control cannot be revived. In addition, the court found that the cooperative had relied upon the sponsor's waiver and had suffered a substantial short-term economic loss. The court thereupon dismissed the petition and validated the inspectors' report notwithstanding that it was not issued until after they had been voted financial benefits by the nonsponsor members of the incumbent board.

The Condominium and Cooperative Abuse Relief Act permits a cooperative corporation to terminate certain types of contracts; that is, "to provide appropriate relief where long-term leases of recreation and other cooperative- and condominium-related facilities are determined to be unconscionable" (15 USC § 3601 [b]; *see also,* § 3607). The law, however, does not deal with the voting of shares by the sponsor except in computing the votes necessary to terminate a contract. In fact, "special developer control" does not by definition extend to the control of a cooperative board acquired through the exercise of share ownership. According to the statute, "[a] developer's right to exercise the voting share allocated to any condominium or cooperative unit which he owns is not deemed a right of special developer control if the voting share allocated to that condominium or cooperative unit is the same voting share as would be allocated to the same condominium or cooperative unit were that unit owned by any other unit owner at that time" (15 USC § 3603 [22]). Thus, although the Condominium and Cooperative Abuse Relief Act specifically excludes from "special developer control" the exercise by a developer of its voting shares so long as its shares are not accorded any greater weight than those of an ordinary unit owner, the Second Circuit in *2 Tudor City Place Assocs. v 2 Tudor City Tenants Corp.* (924 F2d 1247), equated "special developer control" with developer domination of the board of directors.

However, in *Rego Park Gardens Assocs. v Rego Park Gardens Owners* (174 AD2d 337, 339), this court recently decided that whenever the sponsor owns unsold shares it has the right to designate a specified number of directors prior to the selection of the board of directors, and that "[t]he mere fact that new directors may be elected with the votes of the sponsor cannot, without more, be equated with exercising voting control as a matter of law. If respondent can establish

that duly elected directors have breached the fiduciary duty owed to the respondent corporation, then the Business Corporation Law provides procedures for redress". Only if the cooperative corporation can demonstrate that the directors elected by means of the sponsor's votes were on the sponsor's payroll or received other remuneration from the sponsor may the directors so chosen be barred from serving on the board of directors *(Rego Park Gardens Assocs. v Rego Park Gardens Owners, supra)*. Moreover, pursuant to 13 NYCRR 18.3 (v) (5) (iii), in a noneviction plan the sponsor may, if the plan so provides, exercise veto power over certain expenses for a period not to exceed five years after closing, or whenever the unsold shares constitute less than 25% of the total, whichever occurs sooner. This five-year period is mentioned in the corporate bylaws which state that the sponsor may not elect, designate or appoint a majority of the directors or otherwise exercise voting control of the board of directors after the fifth anniversary of the conversion or a majority of the outstanding shares have been acquired by persons who are not holders of unsold shares, whichever is sooner.

There is, therefore, nothing in the law or the bylaws of the corporation which prohibits the sponsor from nominating and/or electing a majority of the board while, as herein, the five year period has not yet been reached, and the sponsor still retains a majority of the shares. The mere failure of the sponsor to maintain continuous control of the board of directors and its filing of amendments to the plan recognizing that it was relinquishing current (but making no reference to future) control of the board does not constitute a permanent waiver of the sponsor's right to reassert majority control, particularly since the cooperative board in no way altered its position to its detriment by relying upon the sponsor's conduct *(see, Nassau Trust Co. v Montrose Concrete Prods. Corp.,* 56 NY2d 175). While it is true that the sponsor is availing itself of an opportunity to reassume control over the board, there does not appear to be anything in the law to preclude such an action. Consequently, the sponsor's votes were improperly disqualified by the inspectors of election, and the Supreme Court should have granted the petition to the extent indicated.

Therefore, the order and judgment (one paper) of the Supreme Court, New York County (Peter Tom, J.), entered on September 20, 1991, which, *inter alia,* denied petitioners' application for a judgment validating and confirming the

election of directors at a shareholders' meeting held on July 18, 1991 and for an injunction to compel the inspectors of election to certify the election of the board of directors on that date, granted respondents' cross motion for summary judgment dismissing the petition and confirming the election to the board of directors on July 18, 1991 as certified by the inspectors of election of Robert Gordon, Michelle Starr, Wayne Reckhow, George Blitz and Kevin Singleton, should be reversed, on the law, and the petition reinstated, the application granted for an order validating and confirming the election of directors at a shareholders' meeting held on July 18, 1991, compelling respondent inspectors of election to certify the election of the board as voted upon on that date and vacating the results of the election as certified by the inspectors of election in their report, and respondents' cross motion denied, without costs or disbursements.

ROSENBERGER, KUPFERMAN and ASCH, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on September 20, 1991, is reversed, on the law, and the petition reinstated, the application granted for an order validating and confirming the election of directors at a shareholders' meeting held on July 18, 1991, compelling respondent inspectors of election to certify the election of the board as voted upon on that date and vacating the results of the election as certified by the inspectors of election in their report, and respondents' cross motion denied, without costs or disbursements.